UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GREGGORY A. MITCHELL,                           :

                Plaintiff,              :          07 Civ. 0285 (JSR) (DF)

   -against-                                    :          **REPORT AND**
                                                          **RECOMMENDATION**

MICHAEL J. ASTRUE, COMMISSIONER    :
OF SOCIAL SECURITY,
                                       :
                Defendant.
------------------------------------------------------------X

**TO THE HONORABLE JED S. RAKOFF, U.S.D.J:**

## INTRODUCTION

     Plaintiff Greggory Mitchell ("Plaintiff") seeks review of the final decision of Administrative Law Judge Suanne Strauss ("ALJ") in favor of the defendant, Michael J. Astrue, the Commissioner of Social Security (the "Commissioner" or "Defendant"). The ALJ's decision denied Plaintiff disability insurance benefits and supplemental security income under the Social Security Act (the "Act") on the ground that Plaintiff's impairments do not constitute a disability for purposes of the Act. Before the Court are the parties' cross-motions for judgment on the pleadings, brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkts. 8; 11.) For the reasons set forth below, I recommend that (1) Defendant's motion for judgment on the pleadings be denied; and (2) Plaintiff's motion for judgment on the pleadings be granted to the extent that this matter be remanded to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

## BACKGROUND

### A.     Plaintiff's Personal and Employment History

Plaintiff was born on October 24, 1960.  (R. 29.)[1]  After completing high school, he attended Vassar College and earned a degree in 1983.  (R. 108; 205; 402.)  Between August, 1984, and July, 2002, Plaintiff pursued a career as a teacher (R. 73), although the record also indicates that, from 1994 through part of 1999, he held positions as an actor, program coordinator, and field supervisor (R. 132).

In February of 1999, Plaintiff began working as a teacher for the New York City Board of Education (the "BOE").  (*Id.*)  Plaintiff's contractual term there ended in December, 2000, and his contract was not renewed.  (*Id.*)  According to Plaintiff, the BOE did not rehire him because of his excessive absences, which were allegedly "due to injuries."  (*Id.*)  In March of 2001, Plaintiff took a position as a job readiness instructor for the City College of New York.  (*Id.*)  Plaintiff was discharged in May of 2001, however, because he charged teaching materials to his department without authorization.  (*Id.*)  In August of 2001, Plaintiff began working as a teacher/youth counselor at the Discipleship Educational Center in Brooklyn, New York.  (*Id.*)

In the late 1990s, Plaintiff had started to suffer from various physical and mental health problems, including back and knee ailments and bipolar disorder.  (*See* R. 104; 142; 146; 194.) In 1999, he was diagnosed as being HIV positive.  (R. 146.)  According to Plaintiff, these medical impairments caused a steady decline in his overall health, and, between 1999 and 2002, they forced him to begin working fewer hours and to alter his job duties.  (*See* R. 104.)  Further,

---

[1] "R" refers to the administrative record compiled by the Commissioner.

2

Plaintiff admitted that a substance abuse problem, which had plagued him since the early 1980s (*see* R. 146; 194), exacerbated his mental health problems (*see* R. 98).

Plaintiff was terminated from his position at the Discipleship Educational Center in June or July of 2002.  (R. 104; 132.)  The purported reason for his termination was frequent absences, which Plaintiff was allegedly forced to take because of physical ailments and mental illness.  (*See* R. 132; 147.)  Plaintiff also claims that his discharge from the Discipleship Educational Center was partially motivated by a desire to retaliate against him for having filed a sexual harassment lawsuit.  (R. 132.)

In September of 2002, Plaintiff enrolled in a graduate program at Fordham University.  (R. 104; 133.)  Plaintiff took a leave of absence during his first semester there, which, he claims, was caused by his mental health problems.  (R. 104; *see also* R. 133.)  Although Plaintiff returned for a brief period during the Spring of 2003, nothing suggests that he ever completed his graduate studies.  (R. 104.)

Plaintiff then remained unemployed until September, 2004, when he took a position as a career center coordinator for the Church Avenue Merchant's Association.  (R. 133.)  Plaintiff was terminated in March, 2005, however, allegedly because of poor attendance, and he claims that his frequent absences from this job were also the result of mental health problems.  (R. 133; 397.)  Between May and June, 2005, Plaintiff served as a job readiness instructor for a company called NYANA.  (R. 133.)  Plaintiff claims that he was discharged from this position because his physical impairments rendered him unable to perform his job duties satisfactorily.  (R. 133.)  Plaintiff's most recent work experience appears to have been as a volunteer coordinator for a Hurricane Katrina hotline, between August and September of 2005.  (*Id.*)

3

As noted above, Plaintiff has a long history of substance abuse that dates back to 1982. (R. 146; 194.)  He began using cocaine and heroin intravenously in 1994, after the death of his mother (R. 146; 331), and evidence also suggests that he was a heavy cocaine user up until at least January of 2004 (R. 255; 346).  Further, on May 24, 2003, Plaintiff was hospitalized after he attempted to commit suicide by overdosing on crack cocaine.  (*See* R. 172.)  Plaintiff was also a heavy drinker; as of May, 2003, he consumed four beers per day.  (R. 176.)  Plaintiff used heroin, marijuana, and ecstasy as well (R. 190; 205; 218), but he did not consume these substances nearly as frequently as cocaine and alcohol (*see* R. 218).

At a November 10, 2005, hearing, Plaintiff testified that he had finally been able to overcome his drug addiction and alcoholism sometime in 2003 or 2004, after participating in a detoxification program.  (R. 391.)  Other than a one-week relapse during the summer of 2005, Plaintiff claims that he remained sober up to, at least, the date of the hearing.  (*Id*.)  The record also contains the results of a drug test that is apparently dated January 9, 2004, and indicates that Plaintiff tested negative for opiates, barbiturates, amphetamines, cocaine, benzodiazepines, and marijuana.  (R. 347.)  Further, a February 10, 2006, medical report prepared by a treating physician states that Plaintiff's polysubstance dependence was "in full remission [then,] but active in 2003."  (R. 359-60.)

> **B.** **Plaintiff's Medical Treatment History**
>
> **1.** **William F. Ryan Community Health Center**

Plaintiff sought treatment and medication from the William F. Ryan Community Health Center (the "Ryan Center") intermittently between September, 2001, and October, 2004. (R. 232-46.)  Many of the notes made in the Ryan Center records are not legible, but it is

apparent that Plaintiff sought treatment from the Ryan Center for HIV, back pain, and bipolar disorder, and that he was prescribed medications to treat these conditions. (*Id*.)

On June 17, 2003, Plaintiff visited the Ryan Center seeking treatment for back pain and a refill of his psychiatric medications. (R. 277.) According to chart notes, Ryan Center physicians declined to refill Plaintiff's medications because, at the time, he was not participating in the Ryan Center's mental health program. (*Id*.) On February 2, 2004, however, doctors at the Ryan Center did refill Plaintiff's psychiatric medications. (R. 294.)

Plaintiff returned to the Ryan Center for treatment on March 12, 2004. (R. 291.) His chief complaint was bipolar disorder, and he requested, and was given, another refill of his psychiatric medications. (*Id*.) On May 17, 2004, Plaintiff presented at the Ryan Center seeking another prescription refill, and he was given a one-month supply of his psychiatric medications. (R. 289-90.) Progress notes for that day indicate that Plaintiff had been referred to the Ryan Center's mental health clinic three months before and that, during Plaintiff's visit, Ryan Center staff had advised him that they would contact him by phone to set up an intake appointment. (*Id*.) On May 19 and May 28, 2004, workers at the Ryan Center attempted to contact Plaintiff to schedule the intake appointment, but Plaintiff did not answer his phone and did not return their calls. (R. 287; 288.)

On June 17, 2004, Plaintiff returned to the Ryan Center, complaining that its employees had not yet contacted him to schedule an intake appointment. (R. 282.) Plaintiff was then told that staff had attempted to call him twice and had also notified him by mail that his intake appointment had been scheduled for June 24, 2004. (*Id*.) Plaintiff was given another prescription refill, and health professionals at the Ryan Center discussed with him the

"importance of keeping appointments." (R. 283-84.) A June 24, 2004, note states that Plaintiff failed to show up for the appointment. (R. 281.) As a result, Ryan Center staff sent Plaintiff a letter requesting that he contact them, if he remained interested in participating in the mental health program. (*Id.*) A June 30, 2004, note states that the Ryan Center again attempted to contact Plaintiff for an intake appointment, to no avail. (*Id.*)

On August 16, 2004, Plaintiff returned to the Ryan Center, requesting a prescription refill. (R. 280.) According to the records for that day, health professionals at the Ryan Center notified Plaintiff that his treatment there would be terminated because they believed that he was only interested in obtaining medication and had no desire to receive counseling and treatment for his mental health conditions. (*Id.*) On October 22, 2004, Plaintiff again sought psychiatric medication from the Ryan Center but his requests were apparently refused. (R. 279.)

## 2.   New York Presbyterian Hospital

On May, 24, 2003, Plaintiff visited the emergency room at the New York Presbyterian Hospital ("NYPH") after he attempted to commit suicide by overdosing on crack cocaine. (R. 172.) On intake, NYPH staff noted that Plaintiff had a past history of HIV infection and bipolar disorder and that he reported that he had not taken his psychiatric medications in months. (R. 172-73; 176.) At the time, however, Plaintiff was well-appearing, articulate, and calm. (R. 173.) Physicians at NYPH initially diagnosed Plaintiff with depression, bipolar disorder, and HIV. (R. 174.)

Notes from a subsequent examination reflect that Plaintiff had a disheveled appearance, complained about depression, and stated that he had five distinct personalities. (R. 176-77.) Plaintiff also requested admittance to a Mental Illness Chemical Abuse Program. (R. 176.)

Based on this examination, a physician noted that, in order to make a diagnosis, the following conditions would need to be ruled out:  bipolar affective disorder, substance abuse disorder, acute cocaine intoxication, and psychosis secondary to substance abuse.  (R. 179.)  Plaintiff spent the night at NYPH and was discharged the following day, on May 25, 2003.  (R. 180.)  On discharge, Plaintiff was diagnosed with cocaine and alcohol abuse, bipolar disorder, depression, and HIV.  (R. 180.)

### 3.    **Beth Israel Medical Center**

Upon his discharge from NYPH on May 25, 2003, Plaintiff was transferred by ambulance to Beth Israel Medical Center ("Beth Israel") and was voluntarily admitted there.  (R. 216; 229.)  On intake, he was diagnosed with crack cocaine, alcohol, and heroin dependence; substance induced mood disorder; and personality disorder not otherwise specified.  (R. 230.)  In addition, a notation was made that bipolar disorder should be ruled out.  (*Id*.)  Dr. Alan Lyman evaluated Plaintiff later that day and prepared a psychiatric admission note reflecting that Plaintiff had been diagnosed with bipolar disorder in 1997 and may have a family history of the condition.  (R. 196; 200.)  During Dr. Lyman's examination, Plaintiff complained of feeling depressed and forlorn and again claimed to have five distinct personalities.  (R. 196.)  Dr. Lyman diagnosed crack, alcohol, opioid, and marijuana dependence and indicated that substance induced mood disorder, bipolar disorder, and Cluster B traits should be ruled out.  (R. 204.)  Plaintiff was admitted to Beth Israel overnight for observation.  (*Id*.)

On the morning of May 26, 2003, Plaintiff indicated that he was unhappy at Beth Israel and asked to be discharged.  (R. 206.)  Plaintiff told Beth Israel staff that he would check in at St. Luke's Roosevelt Hospital and that, if they would not allow him to leave, he would "tear the

place up" and "destroy" the unit.  (R. 206-08.)  Plaintiff was discharged that day and, based on

discharge information, physicians at Beth Israel diagnosed him with cocaine, alcohol, and opioid

dependence, as well as substance-induced mood disorder and bipolar disorder.  (R. 190; 210.)

### 4.   St. Luke's-Roosevelt Hospital, Department of Psychiatry

Plaintiff was treated at St. Luke's-Roosevelt Hospital on and off between September,

2002, and February, 2006.  (R. 138-41; 142; 319-47; 348-61; 370-72.)  Between January 6

and 16, 2003, Plaintiff received inpatient substance abuse and psychiatric treatment from the

Smithers Center at St. Luke's-Roosevelt Hospital (the "Smithers Center").[2]  (R. 319.)  His stated

treatment goals there included long-term sobriety and stabilization of his bipolar disorder.  (*Id*.)

During his January, 2003, course of treatment, physicians at the Smithers Center diagnosed

cocaine, alcohol, and cannabis dependence, as well as bipolar disorder.  (R. 322; 337.)  They also

noted that Plaintiff "did not complete preps; glamorized [drug] use; [and had] little insight into

[his own] powerlessness."  (R. 322.)  Progress notes reflect various disciplinary issues while

participating in group sessions; one note indicates that Plaintiff "ha[d] an attitude of entitlement,

arrogance and dominate[d] the group.  [Plaintiff was] not accepting of decisions by staff [with]

which he disagree[d]."  (R. 339-40; *see also* R. 343 (noting that Plaintiff was uncooperative with

rehab protocol).)

On June 24, 2003, Plaintiff began a course of outpatient treatment in the Dual Diagnosis

Program at St. Luke's-Roosevelt Hospital.  (R. 300.)  His stated purpose for seeking treatment

there was to find a psychiatrist who could prescribe appropriate medication for his bipolar

---

[2] Progress notes from the Smithers Center indicate that Plaintiff also sought treatment
there during the Fall of 2002, but dropped out of the program.  (R. 336.)

disorder.  (*Id.*)   According to a discharge summary prepared on November 11, 2003, Plaintiff

was diagnosed with bipolar disorder and substance abuse dependence, and he admitted that his

cocaine use was "very significant" and that he needed to cut back on it to "lessen its adverse

effects on his life."  (*Id.*)  Plaintiff's attendance in the Dual Diagnosis Program was poor, and

staff made repeated efforts to engage him after he stopped coming in.  (*Id.*)  Plaintiff told them,

however, that he could not fit the program into his schedule because he had started graduate

school and was searching for full-time employment.  (*Id.*)  Staff at St. Luke's-Roosevelt Hospital

then scheduled an appointment for Plaintiff at the Smithers Center, which he did not keep.  (*Id.*)

They also offered him a referral to case management, but Plaintiff did not respond.  (*Id.*)

Plaintiff's treatment at the Dual Diagnosis Program was terminated on November 11, 2003,

apparently because of his poor attendance record.  (*See id.*)  According to a discharge summary,

Plaintiff's primary diagnosis was bipolar disorder and a secondary diagnosis was polysubstance

dependence.  (R. 299.)

In January of 2004, Plaintiff commenced outpatient treatment at the Smithers Center.

(R. 344.)  During his first group meeting, which took place on January 12, 2004, Plaintiff stated

that he did not want treatment and that he intended to continue using crack cocaine, although he

"recognized the problems with its use."  (R. 346.)  After attending only one group session,

Plaintiff did not return.  (R. 345-46.)  Smithers Center staff thereafter attempted to contact him

on numerous occasions.  (*Id.*) They even offered him individual therapy sessions, but Plaintiff

apparently declined treatment.  (R. 344.)

On February 10, 2006, Dr. Lauralyn G. Fredrickson, of St. Luke's-Roosevelt Hospital,

examined Plaintiff and completed a general medical report.  (R. 359-60.)  According to the

report, Dr. Fredrickson had treated Plaintiff between June and November of 2003. (R. 359.) In

the February 10, 2006, report, she diagnosed Plaintiff with bipolar disorder and polysubstance

dependence, but she noted that Plaintiff's polysubstance dependence was "in full remission."

(*Id*.) Dr. Fredrickson also described Plaintiff's "current symptoms" as "stable," but she noted

that, in 2003, he had been an active drug user, and, at that time, he had shown "disorganized

thinking, racing thoughts, grandiose ideas, [and] little insight." (*Id*.)

### 5.   Dr. Emily Senay

Between December 30, 2005, and February 10, 2006, Dr. Emily Senay treated Plaintiff

for his physical impairments, as well as his bipolar disorder and psychotic panic attacks.

(R. 348.) Based on the administrative record, it appears that Dr. Senay was a private physician.

On February 10, 2006, Dr. Senay completed a general medical report for Plaintiff, and she listed

his symptoms as anxiety, paranoia, back pain, pruritus, knee/ankle pain, and neuropathy. (*Id*.)

Although Dr. Senay was a treating physician, she assessed Plaintiff's mental functioning

capacity for the Commissioner and prepared a report, entitled "Medical Assessment of Ability to

Do Work-Related Activities." (R. 356-58.) Therein, she concluded that Plaintiff's ability to deal

with the public, to deal with work stresses, to function independently, and to maintain attention

concentration was "poor." (R. 356.) His ability to use judgment and interact with supervisors

was, in Dr. Senay's opinion, "fair," and his ability to follow work rules and relate to co-workers

was "good." (*Id*.) In her report, Dr. Senay also stated that Plaintiff's ability to understand,

remember, and carry out even simple job instructions was "fair" (R. 357), and she described his

ability to maintain personal appearance, behave in an emotionally stable manner, relate

predictably in social situations, and demonstrate reliability as "poor/none" (*id*.).  Dr. Senay also wrote that Plaintiff was "not stable to maintain benefits routinely – unpredictable."  (R. 358.)

### C. Plaintiff's Consultative Examination History

#### 1. Dr. Howard Finger

Dr. Howard Finger, an internal medicine specialist, examined Plaintiff on October 15, 2002, and prepared a written report of his findings.  (R. 142-44.)  According to that report, Plaintiff arrived for the examination by himself and took public transportation.  (R. 142.)  He was alert and oriented, and his speech was clear.  (R. 144.)  Plaintiff admitted to having a long history of substance abuse, but, at the examination, he reported that he was "clean in recent times" and was receiving outpatient treatment at the Smithers Center.  (R. 142.)  During the examination, Plaintiff complained of lower back pain and long term depression, and Dr. Finger noted that Plaintiff was initially diagnosed with bipolar disorder in 1997.  (*Id*.)  Plaintiff reported that, due to his impairments, he was only able to perform "light household activities."  (*Id*.)  Dr. Finger's impressions included, among other things, "chronic depression" and "history of substance abuse," and he believed that Plaintiff's overall prognosis was "guarded."  (R. 144.)

#### 2. Dr. Richard King

Psychiatrist Richard King also examined Plaintiff on October 15, 2002.  (R. 146-47.)  Dr. King noted that Plaintiff appeared for the examination alone and had taken the subway.  (R. 146.)  According to Dr. King's report, Plaintiff stated that he had been anxious and depressed for several years and that these symptoms worsened in 1999, when he discovered that he was HIV positive.  (*Id*.)  Plaintiff also told Dr. King that he had been using drugs for decades and that he had last used cocaine and heroin three weeks before the date of the examination.  (*Id*.)

Plaintiff described a manic episode as "going on drug binges, and staying up to clean his room[] or go[] to the gym." (*Id*.)

Dr. King reported that Plaintiff's speech was "coherent and relevant with no thought disorder." (*Id*.) Plaintiff's mood was euthymic, and he was not significantly depressed or anxious. (*Id*.) In Dr. King's opinion, Plaintiff was not a suicide risk, his intellectual functioning was average, and his insight and judgment were fair. (*Id*.) Further, Dr. King wrote that Plaintiff's "[a]ttention and concentration were adequate. Fund of information was adequate. Memory was grossly intact. Sensorium was clear [and Plaintiff] was oriented to time, place and person." (*Id*.)

Dr. King concluded that Plaintiff was able to perform daily activities, including household chores and shopping. (*Id*.) He noted that Plaintiff enjoyed watching TV and reading and remained in contact with friends. (*Id*.) Dr. King also believed that Plaintiff had a "satisfactory ability to understand, carry out and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting." (R. 147.)

Dr. King diagnosed mild dysthymia disorder and intravenous heroin and cocaine dependence, and he indicated that substance induced mood disorder should be ruled out. (*Id*.) He believed that Plaintiff could benefit from psychiatric treatment and a substance abuse rehabilitation program. (*Id*.) Dr. King's overall prognosis was "[d]ependent on the course of [Plaintiff's] illness." (*Id*.) He also expressed the view that Plaintiff was able to manage his own funds, although he was "at risk to abuse substances." (*Id*.)

### 3. <u>Dr. Herman Berliss</u>

On November 20, 2002, Dr. Herman Berliss, a state agency medical consultant, assessed Plaintiff's mental residual functional capacity. (R. 154-56.) Dr. Berliss concluded that Plaintiff was not significantly limited in any respect. (*Id.*) The extent to which Plaintiff was actively using drugs and alcohol at the time of Dr. Berliss's examination is not clear; Dr. Berliss's report states only that Plaintiff "does drugs." (R. 155.)

### 4. <u>Dr. Herbert Meadow</u>

On October 1, 2003, psychiatrist Herbert Meadow examined and evaluated Plaintiff. (R. 247.) At the examination, Plaintiff reported daily cocaine use and stated that he had used heroin in the preceding six months. (R. 247.) Plaintiff also discussed his May, 2003, hospitalization, but apparently did not inform Dr. Meadow that he had attempted to commit suicide by overdosing on crack cocaine, stating only that he believed a "manic episode" had resulted in the hospitalization. (*Id.*) Plaintiff explained that, during such an episode, he experienced a period of sleeplessness, racing thoughts, rapid speech, and grandiosity and felt as if he were invincible. (*Id.*) During a depressed state, on the hand, Plaintiff reported that he was vegetative and withdrawn and did not clean or take care of himself. (*Id.*)

Dr. Meadow found Plaintiff's speech to be coherent and goal-directed, and he did not discern any thought disorder, delusions, hallucinations, or paranoia. (*Id.*) He did note, however, that Plaintiff's mood was mildly to moderately depressed, and his "affect was blunted." (*Id.*) Dr. Meadow considered Plaintiff's intelligence level to be average and found his insight and judgment unimpaired. (R. 247-48.) Dr. Meadow's report lists Plaintiff's daily activities as

watching television, listening to music, reading, cooking, cleaning, shopping, and going for walks.  (R. 248.)

Dr. Meadow diagnosed cocaine and heroin dependence, as well as bipolar disorder.  (*Id*.) He believed that Plaintiff's overall prognosis was "guarded," and he suggested that Plaintiff remain in treatment.  (*Id*.)  Dr. Meadow concluded that Plaintiff "suffers from moderate difficulties in his personal, social and occupational adjustment that would impair his ability to tolerate work pressures."  (*Id*.)  He also opined that Plaintiff would be able to manage his own funds.  (*Id*.)

### 5.   Dr. Soo Park

Dr. Soo Park, an internist, examined Plaintiff with respect to his physical impairments on October 1, 2003.  (R. 249-50.)  At the examination, Plaintiff revealed that he suffered from knee and back pain, as well as HIV.  (R. 249.)  He also claimed to have had bipolar disorder for the preceding six years.  (*Id*.)  Dr. Park listed her final impressions as arthritis in the left knee, back pain in lumbar spine, HIV infection, hepatitis B, "drug abuse, still using," and bipolar disorder. (R. 250.)  Her overall prognosis for Plaintiff was fair, and she recommended continued medical care.  (*Id*.)

### 6.   Kusum Walia, Ph.D.

Psychologist Kusum Walia evaluated Plaintiff on November 18, 2003, and prepared a mental residual functional capacity assessment.  (R. 253-55.)  At the time of Dr. Walia's examination, Plaintiff was using cocaine on a daily basis.  (R. 255.)  For the most part, Dr. Walia assessed no significant limitation in Plaintiff's mental functional capacity.  (R. 253-54.)

Dr. Walia did conclude, however, that Plaintiff was moderately limited in his ability to: (1) "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; (2) "work in coordination with or proximity to others without being distracted by them"; (3) "complete a normal workday or week without interruptions from psychologically based symptoms and . . . perform at a consistent pace without an unreasonable number and length of rest periods"; (4) "accept instructions and respond appropriately to criticism from supervisors"; and (5) get along with colleagues "without distracting them or exhibiting behavioral extremes." (*Id.*)

Dr. Walia found Plaintiff to be alert, oriented, and coherent and discerned no delusions, thought disorder, or hallucinations. (R. 255.) Dr. Walia opined that Plaintiff's intelligence level was average and his judgment was unimpaired, although his mood was depressed and his affect was blunted. (*Id.*) Finally, Dr. Walia did not find Plaintiff's allegations to be "fully credible" and believed that, while Plaintiff did have some psychiatric limitations, they were not as severe as he alleged. (*Id.*)

### D.   Procedural History

#### 1.   Plaintiff's Application For Benefits

On or about July 17, 2003, Plaintiff applied to the Social Security Administration for disability insurance benefits and supplemental security income for an ongoing period beginning July 7, 2002. (R. 18; 49-52; 388.) Plaintiff's application was based on the claimed impairments of bipolar disorder, borderline personality disorder, psychosis, HIV, substance abuse disorder, paranoia, ADHD, and severe depression. (R. 49.) His application was initially denied on

December 3, 2003 (R. 18; 30-35), and, thereafter, Plaintiff filed a timely request for an administrative hearing before an ALJ (R. 18; 36; 38).

### 2.   The Administrative Hearing

Plaintiff appeared for an evidentiary hearing before the ALJ on November 10, 2005. (R. 388.)  At the outset of the hearing, the ALJ informed Plaintiff that, even assuming he were disabled, he would not be entitled to benefits if his substance abuse problem was a contributing factor material to his disability.[3]  (R. 389.)  Plaintiff indicated that he understood, and the ALJ proceeded to question him about his HIV status and whether he was taking medication to treat the same.  (*Id.*)  Plaintiff testified that he was not and stated that his viral load and T-cell count did not require them.  (*Id.*)  He also stated that he had discontinued HIV treatment because he constantly missed appointments and had difficulty leaving his home.  (R. 390.)

The ALJ then suggested that the actual reason for Plaintiff's frequent absences from treatment was a substance abuse problem.  (R. 390-91.)  She reminded Plaintiff that his medical records were replete with evidence of drug use through 2003, and that some lab work for parts of 2004 and 2005 suggested that he was taking drugs at that time as well.[4]  (R. 390.)  Plaintiff then explained that he had entered a drug rehabilitation program sometime in 2003 or 2004 and, other than a one-week relapse during the summer of 2005, after which he received further detoxification treatment, he had been "clean."  (R. 391.)

---

[3] *See* 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this title . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."); *see also* 42 U.S.C. § 1382c(a)(3)(J).

[4] The ALJ later indicated that the most recent records evidencing substance abuse were from 2004.  (R. 406.)

The ALJ asked Plaintiff if he had returned to psychiatric care, and Plaintiff responded that he had not.  (*Id*.)  Plaintiff claimed that he had been trying to obtain psychiatric treatment, but that his participation in Medicaid effectively precluded him from so doing because Medicaid participants face a number of obstacles before they can see a psychiatrist.  (R. 390-91.)  Plaintiff claimed that, given his state of mind, he was unable to follow the Medicaid protocol and obtain psychiatric treatment.  (*Id*.)

The ALJ suggested that the reason Plaintiff was not receiving psychiatric treatment at the time of the hearing was his own inaction and lack of correspondence with workers at treatment facilities, despite their repeated efforts to engage him.  (R. 393.)  The ALJ noted that the 2004 records from the Ryan Center indicated that Plaintiff had been referred to the mental health clinic, but, when staff members attempted to contact him for an intake appointment, he never returned their calls, and, when they did schedule an intake appointment, he did not show up. (R. 394.)  In response, Plaintiff claimed that he was "housebound" at the time and that his cell phone may not have been working.  (*Id*.)  He then claimed that the Ryan Center employees did not make any efforts to engage him, and that their suggestions to the contrary were fabricated and meant to cover up their poor care.  (R 394-95.)

The ALJ questioned Plaintiff about his living situation, and he told her that he lived in an apartment and received support from an HIV assistance program.  (R. 395.)  Later questioning revealed that Plaintiff performed his own household chores and food shopping.  (R. 399.)  When the ALJ asked Plaintiff if he had worked in 2004, he first indicated that he had not.  (R. 396.) When the ALJ then pointed to evidence in the record stating that he had, Plaintiff testified that he had worked as a teacher, but was fired after four months because of excessive absences.

(R. 396-97.)  He claimed that the absences were not caused by his drug addiction, but, rather, that they were the result of either paranoia stemming from his mental health problems or sickness, which was a side effect of certain medications that Plaintiff had been taking.  (R. 397.) The ALJ pointed out that Plaintiff's medical records did not reveal any side effects, and Plaintiff responded that his medication did cause unwanted side effects, but that he was careful not to report them to his treating physicians lest they stop prescribing him the medications and he would "really not be able to function."  (*Id*.)

The ALJ proceeded to question Plaintiff about his job with the New York City BOE, and Plaintiff stated that he was asked to leave due to chronic absences.  (R. 398-99.)  The ALJ then intimated that Plaintiff's drug use may have been instrumental in his discharge, and, in response, Plaintiff admitted that he had used drugs at the time, but testified that the drugs were not interfering with his work.  (R. 399.)  Plaintiff claimed that his drug use was "more health damaging than employment damaging[; his] absences were the result of whether or not [he] was taking [his] medication, and was experiencing a bipolar swing."  (*Id*.)

After the ALJ finished questioning Plaintiff, Plaintiff's counsel asked him how often he visited the emergency room for his medical impairments.  (R. 400.)  Plaintiff responded that he had gone practically every week since the summer of 2005 because his mental health condition continued to worsen.  (*Id*.)  Plaintiff claimed that he sought emergency room treatment frequently because he needed medical care, but that he had been unable to make or keep psychiatric appointments at Mt. Sinai Hospital.  (*Id*.)

Plaintiff further testified that he saw a psychiatrist during the summer of 2005, who prescribed medications that "zombied [Plaintiff] out."  (R. 401.)  Plaintiff also reiterated that he

sought treatment at Mt. Sinai Hospital, but that he never followed through with it because he was barely functional and did not open his mail.  (*Id*.)  He also claimed that he occasionally experienced "clear days," during which he was able to function, but that these days were interrupted by periods of paranoia which rendered him housebound.  (R. 404.)  In fact, Plaintiff claimed that he was only able to attend the administrative hearing because he had experienced some clear days, during which he was able to open his mail and discover the hearing notice. (*Id*.)

Towards the end of the hearing, the ALJ reminded Plaintiff that substance abuse could serve as a basis to deny his claim (R. 406), and quoted Plaintiff's application for benefits, which states that "substance abuse combined with depression and mania makes for an unfortunate and unpredictable existence" (R. 407; *see also* R. 98).  Plaintiff responded that he agreed with his prior statement, but, "in the absence of substance abuse[,] things don't get better."  (*Id*.)  In conclusion, the ALJ noted that some of Plaintiff's drug treatment records were missing, and she directed Plaintiff to submit them for her consideration, as well as any other evidence "that is out there."  (R. 409.)

### 3.     The ALJ's Decision

On March 7, 2006, the ALJ issued a decision denying Plaintiff disability insurance benefits and supplemental security income.  (R. 18-28.)  In her decision, the ALJ first found that Plaintiff met the insured-status requirement for the relevant time period.  (R. 21.)  She then employed the five-step sequential evaluation mandated by the Social Security Administration, 20 C.F.R. §§ 404.1520, 416.920,[5] and concluded that Plaintiff had not engaged in substantial gainful

---

[5] *See infra*, at 26-29.

activity at any time relevant to his claim.  (*Id*.)  Proceeding to the second step, the ALJ found

that Plaintiff's "substance addiction disorder (drugs and alcohol)," HIV positive status, bipolar

disorder, knee pain, and lower back derangement constituted severe impairments for purposes of

20 C.F.R. §§ 404.1520(c) and 416.920(c).  (*Id*.)

　　　Next, the ALJ concluded that Plaintiff was disabled for purposes of the Act because his

bipolar disorder and polysubstance abuse disorder met the criteria of an impairment listed in 20

C.F.R., Pt. 404, Subpt. P, App. 1 ("Appendix 1.").  (R. 21-23.)  Specifically, she found that these

conditions satisfied the requirements of sections 12.04 and 12.09, respectively, of Appendix 1

because they caused a marked restriction of Plaintiff's activities of daily living, marked

difficulties in maintaining social functioning, and marked difficulties in maintaining

concentration, persistence, or pace.[6]  (R. 21-23; *see also* 20 C.F.R., Pt. 404, Subpt. P, App. 1,

---

　　　[6]  According to section 12.04, affective disorders are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04.  Further, "[t]he required level of severity for these disorders is satisfied when either paragraphs A and B are satisfied or when paragraph C is satisfied.  *Id*.  Implicit in the ALJ's decision was a finding that Plaintiff's bipolar disorder and substance addiction disorder met the requirements of paragraph A, which is satisfied where, *inter alia*, a claimant suffers from "[m]edically documented persistence, either continuous or intermittent, of [b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)."  *Id*. § 12.04(A).  At issue here is paragraph B, which is met when the affective disorder results in at least two of the following:

　　　　　1.　　　Marked restriction of activities of daily living; or

　　　　　2.　　　Marked difficulties in maintaining social functioning; or

　　　　　3.　　　Marked difficulties in maintaining concentration, persistence, or pace; or

　　　　　4.　　　Repeated episodes of decompensation, each of extended duration.

§§ 12.04(B), 12.09.)  The ALJ did not consider the two conditions separately, but, rather, she determined that each condition, as exacerbated by the effects the other, met the requirements of the relevant listing.  (*See* R. 21-23.)  This approach was consistent with the governing regulations.  *See* 20 C.F.R. §§ 404.1535, 416.935.

The ALJ then went on to consider a hypothetical question:  whether Plaintiff's impairments would be disabling for purposes of the Act if he were to refrain from substance abuse.[7]  (R. 23-28; *see also* 20 C.F.R. §§ 404.1535, 416.935.)  In this regard, she found that, if Plaintiff stopped using drugs and alcohol, he would continue to suffer from low back derangement and left knee pain, as well as bipolar disorder.  (R. 23.)  The ALJ found that Plaintiff's bipolar disorder would not be as severe, however, as it would not be exacerbated by polysubstance abuse.  (*Id*.)  The ALJ concluded that, even if Plaintiff stopped using drugs and alcohol, he would continue to have a severe impairment or combination of impairments within the meaning of the Commissioner's regulations.  (*Id*.)

The ALJ next determined that, if Plaintiff refrained from substance abuse, he would not suffer from an impairment or combination of impairments that met or equaled an impairment listed in Appendix 1.  (R. 23-24.)  As to Plaintiff's bipolar disorder, the ALJ essentially tracked her analysis discussed above, where she found that this condition, as exacerbated by substance abuse, met the requirements of paragraph B of section 12.04 of Appendix 1.  (*Id*.)  The ALJ

---

*Id*.  Section 12.09 provides that the required severity for a substance addiction disorder is met when, *inter alia*, the requirements of section 12.04 are satisfied.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.09.

[7] *See infra*, at 28.

concluded, however, that, if Plaintiff stopped using drugs, none of paragraph B's requirements would be satisfied. (R. 23-24.) Specifically, she found that, if Plaintiff discontinued his drug use, his daily living activities would be only mildly limited. (R. 23.) This finding was grounded on evidence suggesting that Plaintiff watched television, listened to music, read, cooked, cleaned, shopped, and rode public transportation. (*Id*.)

The ALJ next found that Plaintiff's social functioning would be only mildly limited by his bipolar disorder, were he to stop using drugs and alcohol. (*Id*.) The stated basis for this finding was the fact that Plaintiff had been able to teach for four months in 2004, a job that, the ALJ noted, entailed close personal contact and communication with students. (*Id*.) The ALJ also implied that Plaintiff's disciplinary issues and his inability to get along with others in group therapy sessions (both of which supported her prior finding that Plaintiff's bipolar disorder, combined with the effects of substance abuse, did cause marked difficulties in social functioning) would cease, if Plaintiff stopped consuming drugs and alcohol. (*See* R. 23 ("[Plaintiff]'s repeated instances of noncompliance with both medication and treatment are clearly related to his ingoing polysubstance abuse. It can only be presumed that if he were clean and sober, he would attend therapy, take medications and otherwise cooperated [sic] with appropriate treatment for his remaining impairments.").)

The ALJ also found that Plaintiff's concentration, persistence, and pace would be moderately limited by his bipolar disorder, absent the effects of substance abuse, and supported this finding with Dr. Meadow's report, which opined that Plaintiff's intelligence level was average, and that his insight and judgment were not impaired. (R. 23-24.) The ALJ noted that Dr. Meadow found that Plaintiff suffered from "moderate" difficulties in occupational

adjustment which, in her view, supported a finding that Plaintiff's "concentration, persistence, or pace was moderately limited by his bipolar disorder exclusive of the effects of his substance addiction."[8]  (*Id.*)

In the next part of her analysis, the ALJ determined that, if Plaintiff's substance abuse ceased, he would have the residual functional capacity to meet the rigors of a full range of unskilled light work.  (R. 25.)  She noted that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently and was able to stand, walk and sit up to six hours per work day with normal breaks.  (*Id.*; R. 27.)  She also determined that Plaintiff's severe mental impairments, absent the effects of his polysubstance abuse, permitted him to perform unskilled work.[9]  (R. 24-25 (citing 20 C.F.R. §§ 404.1568(a), 404.1599(a), and 416. 968(a)).)

The ALJ next determined that, if Plaintiff refrained from using drugs and alcohol, he would nevertheless be unable to perform his past relevant work as a teacher.  (R. 27.)  The ALJ went on to conclude, however, that, if Plaintiff's substance abuse stopped, "considering his age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that [Plaintiff] could perform."  (*Id.*)  The ALJ did not

---

[8] The ALJ also concluded that, if Plaintiff stopped using drugs and alcohol, his physical impairments would not meet or equal an impairment listed in Appendix 1.  (R. 24.)

[9] The ALJ spent much of her analysis in this regard explaining that she did not find Plaintiff to be a credible witness.  (*See* R. 25-26.)  She found that his mental impairments could produce the symptoms alleged, but that his testimony concerning the intensity, duration, and limiting effects of the symptoms was simply not credible.  (R. 25.)  She also stated that there was no evidentiary support for Plaintiff's contention that, other than a one week relapse, he had been sober since 2003 or 2004.  (R. 26.)

consult a vocational expert in this regard.  (*See id.*)  Rather, she reached this conclusion by

applying Medical-Vocational Rule 202.21.[10]  (*Id.*)

The ALJ ultimately determined that Plaintiff would not be disabled within the meaning of

the Act, if he were to stop consuming drugs and alcohol, and, therefore, she found that substance

abuse was a contributing factor material to her initial determination that Plaintiff was disabled.

(R. 28.)  Thus, applying 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J), the ALJ concluded that

Plaintiff was not disabled for purposes of the Act.  (*See* R. 28.)

### 4. <u>Plaintiff's Appeal</u>

On March 25, 2006, Plaintiff requested a review of the ALJ's decision (R. 10-13), but the

Appeals Council denied review on November 18, 2006 (R. 5-7), thereby making the ALJ's

decision the final decision of the Commissioner.  Plaintiff commenced this action on January 12,

2007.  (Complaint, dated Jan. 12, 200[7][11] (Dkt. 1).)  On August 15, 2007, Defendant moved for

judgment on the pleadings (*see* Defendant's Notice of Motion, dated Aug. 14, 2007 (Dkt. 8)),

and, on August 27, 2007, Plaintiff cross-moved for judgment on the pleadings (*see* Plaintiff's

Cross-Motion, dated Aug. 24, 2007 (Dkt. 11)).

---

[10] According to this rule, a younger individual is not disabled under the Act if he or she has an exertional capacity for light work, has a high school education "or more," and does not have any transferable skills.  *See* 20 C.F.R., Pt. 404, Subpt. P, App. 2, Rule 202.21.

[11] The Complaint is actually dated January 12, 2006, but this date appears to be a typographical error, as the Court's docket report for this case reflects that the Complaint was filed on January 12, 2007, and the ALJ decision that Plaintiff is challenging was issued on March 7, 2006.

In its motion, Defendant asserts that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence, and that the determination must therefore be upheld.  (*See generally* Defendant's Memorandum of Law in Support of The Commissioner's Motion for Judgment on the Pleadings, dated Aug. 14, 2007.)  Plaintiff, on the other hand, asserts that the ALJ's determination was not supported by substantial evidence, and, therefore, it should be reversed and remanded to the ALJ for further proceedings.  (*See generally* Plaintiff's Memorandum of Law in Support of His Motion for a Judgment on the Pleadings, dated Aug. 24, 2007 ("Pl. Mem.").)  Specifically, Plaintiff argues that:  (1) the ALJ's finding that, if Plaintiff refrained from substance abuse, his bipolar disorder would not meet the criteria of section 12.04 of Appendix 1 ignored governing regulatory standards and was not supported by substantial evidence; and (2) the ALJ's determination that Plaintiff's bipolar disorder permitted the performance of unskilled work was legally improper and was not supported by substantial evidence.  (*Id*., at 12-17.)  Plaintiff urges this Court to remand this matter to the Commissioner solely for a calculation of benefits.  (*Id*., at 17.)  In the alternative, Plaintiff seeks a remand for a new hearing and decision.  (*Id*.)

## DISCUSSION

## I.     APPLICABLE LEGAL STANDARDS

### A.     Standard of Review

Pursuant to the Act, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence has been defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389,

401 (1971) (internal quotation marks and citation omitted).  If the Court finds that substantial

evidence exists to support the ALJ's determination, the decision will be upheld, even if contrary

evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *see also DeChirico v.

Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (decision affirmed where there was substantial

evidence for both sides).  This standard applies to findings of fact as well as to inferences and

conclusions drawn from such facts.  *D'Amato v. Apfel*, No. 00 Civ. 3048 (JSM), 2001 U.S. Dist.

LEXIS 9459, at *10 (S.D.N.Y. Jul. 10, 2001) (citing *Levine v. Gardner*, 360 F.2d 727, 730 (2d

Cir. 1966)).

The Court, however, must also determine whether the ALJ applied the correct legal

standard.  *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999).  "'Where an error of law has been

made that might have affected the disposition of the case, this court cannot fulfill its statutory

and constitutional duty to review the decision of the administrative agency by simply deferring

to the factual findings of the ALJ.'"  *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

(quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)).  The Court reviews

*de novo* whether the correct legal principles were applied and whether the legal conclusions

made by the ALJ were based on those principles.  *See id.*; *see also Johnson v. Bowen*, 817 F.2d

983, 985 (2d Cir. 1987).

### B.    The Five-Step Procedure

To be entitled to benefits under the Act, a plaintiff must establish that he has a

"disability."  *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  The term "disability" is

defined in the Act as an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Balsamo*, 142 F.3d

at 79.  Moreover,

> [a]n individual shall be determined to be under a disability only if
> his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B).

In evaluating a disability claim, the ALJ must follow the five-step procedure set out in

the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R.

§§ 404.1520, 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  First,

the ALJ must determine whether the claimant is engaged in substantial gainful activity.

20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, the second step requires the ALJ to

consider whether the claimant has a "severe" impairment or combination of impairments that

significantly limit his or her physical or mental ability to do basic work activities.  *Id*.

§§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an

impairment, then the third step requires the ALJ to determine whether this impairment meets or

equals a listed impairment in Appendix 1 of the regulations.  *Id*. §§ 404.1520(a)(4)(iii),

416.920(a)(4)(iii).  If the claimant's impairment meets or equals one of those listed, the claimant

is presumed to be disabled "without considering [the claimant's] age, education, and work

experience."  *Id*. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).  If the presumption does not

apply, then the fourth step requires the ALJ to determine whether the claimant is able to perform his or her "past relevant work." *Id*. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether the claimant is capable of performing "any other work" that exists in the national economy. *Id*. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).

If the ALJ finds that a claimant is disabled under the Act, but the record contains evidence of substance abuse, the ALJ must determine whether the claimant's drug addiction and/or alcoholism is a contributing factor material to the determination of disability.  *See* 20 C.F.R. §§ 404.1535, 416.935.  The key factor in this analysis is whether the claimant would still be disabled under the Act, even were he to stop using drugs and alcohol.  *Id*. §§ 404.1535(b)(1), 416.935(b)(1).  In making this determination, the ALJ must consider what medical impairments would remain, if the claimant were to refrain from substance abuse, and then determine if these impairments would be disabling.  *Id*. §§ 404.1535(b)(2), 416.935(b)(2).  If the ALJ finds that the remaining impairments would not be disabling, then the claimant's substance abuse problem is a contributing factor material to the determination of disability, and, pursuant to statute, the claimant is not disabled within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); *see also* 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i).  If, on the other hand, the remaining limitations are disabling, then the claimant's substance abuse is not a contributing factor material to the determination of disability, and the claimant is disabled for purposes of the Act.  20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).

In making a determination pursuant to the process discussed above, the ALJ must consider four sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical

opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (internal citations and quotation marks omitted).

Under the procedure set out in the governing regulations, "[t]he claimant bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment." *Berry*, 675 F.2d at 467. Once it has been determined that the claimant cannot perform his past relevant employment, the burden shifts to the Commissioner to prove "'that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.'" *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)). The Commissioner must prove that the claimant can perform the alternative work "considering not only his physical and mental capabilities, but also his age, his education, and his experience and training." *Berry*, 675 F.2d at 467 (internal citations omitted). When the record contains evidence of substance abuse, "the claimant bears the burden of proving that substance abuse is not a contributing factor material to the disability determination." *Lugo v. Barnhart*, No. 04 Civ. 1064 (JSR)(MHD), 2008 U.S. Dist. LEXIS 16926, at *64 (S.D.N.Y. 2008).

### C.   **Opinions of Treating Physicians**

The ALJ must give "controlling weight" to a treating physician's opinion, as long as the treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also* 20 C.F.R. § 416.927(d)(2). Where the ALJ decides to give less than

controlling weight to a treating physician's opinion, "the ALJ must apply a series of factors in determining the weight to give such an opinion."  *Aronis v. Barnhart*, No. 02 Civ. 7660 (SAS), 2003 U.S. Dist. LEXIS 22486, at *14 (S.D.N.Y. Dec. 11, 2003) (citing 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2)).  These factors include:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) the specialization of the physician providing the opinion.  20 C.F.R §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that these factors "must be considered when the treating physician's opinion is not given controlling weight").

### D.   The ALJ's Obligation To Develop a Complete Record

Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative duty to develop the administrative record.  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Secretary of Health & Human Services*, 685 F.2d 751, 755 (2d Cir. 1982)).  The duty to develop the record exists even where a claimant is represented by counsel.  *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).  The Secretary's regulations describe this duty by stating that, "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."  20 C.F.R. § 404.1512(d); *see also* 20 C.F.R. § 416.912(d).  "This affirmative duty is enhanced when the record sought is that of a treating physician."  *Nozan v.*

*Commissioner of Social Security*, No. CV-05-1948 (FB), 2006 U.S. Dist. LEXIS 74202, at *12

(E.D.N.Y. Oct. 11, 2006) (citing *Jones v. Apfel*, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999)).

　　　If the opinion of a treating physician is not adequate, the ALJ must "recontact" the

treating physician for clarification.  *See* 20 C.F.R. § 404.1512(e) (stating that, "[w]hen the

evidence we receive from your treating physician or psychologist or other medical source is

inadequate for us to determine whether you are disabled, we will need additional information to

reach a determination or a decision"); *see also* 20 C.F.R. § 416.912(e).  "Specifically, this duty

requires the Commissioner to 'seek additional evidence or clarification' from the claimant's

treating sources when their reports 'contain[] a conflict or ambiguity that must be resolved.'"

*Osorio v. Barnhart*, No. 05-CV-1188 (FB), 2007 U.S. Dist. LEXIS 38067, at *15 (E.D.N.Y.

May 25, 2007) (citing 20 C.F.R. § 404.1512(e)(1)); *see also Bergen v. Astrue*, No. 06-CV-3419

(FB), 2007 U.S. Dist. LEXIS 55079, at *10 (E.D.N.Y. July 31, 2007) (where opinion of treating

physician is ambiguous, ALJ must seek clarification).  Moreover, "an ALJ cannot reject a

treating physician's diagnosis without first attempting to fill any clear gaps in the administrative

record."  *See Rosa,* 168 F.3d at 79.  Failure to develop the record and "[f]ailure to provide 'good

reasons' for not crediting the opinion of a claimant's treating physician" are grounds for remand.

*Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  Additionally, if the information obtained from

the medical sources is insufficient to make a disability determination or the Commissioner is

unable to seek clarification from treating sources, the regulations provide that the Commissioner

should ask the claimant to attend one or more consultative evaluations.  20 C.F.R.

§§ 404.1512(f), 416.912(f).

**II.**     **REVIEW OF THE ALJ'S DECISION**

   **A.**     **The ALJ Properly Applied the Governing Standard.**

Plaintiff's first claim of error is that, in finding that Plaintiff's substance abuse was a

contributing factor material to the determination of disability, the ALJ did not apply the proper

regulatory standard.  (Pl. Mem., at 13.)  In support of this argument, however, Plaintiff appears

to suggest only that it is not possible to discern whether the ALJ actually did apply the correct

standard, as she did not explicitly use the phrase "contributing factor material to the

determination of disability."  (*See id*.)  The Court notes, however, that the ALJ *did* articulate this

standard in her decision.  (*See* R. 20; 28.)

Moreover, under the relevant regulations, the ALJ was required to determine (1) what

impairments would remain, if Plaintiff stopped using drugs and alcohol, and (2) whether the

remaining impairments, absent the effects of substance abuse, would be disabling for purposes of

the Act, *see* 20 C.F.R. §§ 404.1535, 416.935, and this is precisely what the ALJ did in her

analysis.  After finding that Plaintiff was disabled under the Act because his bipolar disorder and

substance dependence met the relevant listings in Appendix 1, the ALJ went on to determine

that, if Plaintiff were to stop using drugs and alcohol, his remaining impairments would not be

disabling under the Act.  (R. 23-28.)  Thus, as a general matter, the ALJ applied the proper

standard, and Plaintiff's first argument fails.  *See Eltayyab v. Barnhart*, No. 02 Civ. 925 (MBM),

2003 U.S. Dist. LEXIS 21945, at *12 (S.D.N.Y. Dec. 2, 2003).

**B.**      **The ALJ's Finding that Plaintiff's Substance Abuse
Was a Contributing Factor Material To the Disability
Determination Is Not Supported by Substantial Evidence.**

More persuasive is Plaintiff's challenge to the sufficiency of the evidence supporting the
ALJ's finding that substance abuse was a contributing factor material to her initial finding of
disability.  It is clear that Plaintiff had a substance abuse problem during much of the time
relevant to this claim, and he does not contend otherwise.  Mere evidence of substance abuse,
however, is not enough to sustain the finding made here by the ALJ.  With respect to that
finding, the relevant evidence is only that which relates to the impact of Plaintiff's substance
abuse on his disability.  The question is whether substantial evidence supports the ALJ's finding
that, if Plaintiff were to stop consuming drugs and alcohol, his bipolar disorder would improve to
the point that it no longer would be considered disabling under the Act, *i.e.* to the point where
paragraph B of section 12.04 of Appendix 1 would no longer be satisfied.  (*See supra*, at 20-21
n.6.)

On this question, an examination of the record reveals a distinct lack of evidence to
support the ALJ's finding.  Certainly, no physician or other medical professional ever expressly
formulated an opinion as to the probable effects of Plaintiff's bipolar disorder, were he to stop
using drugs and alcohol.  Most of the medical evidence actually reports separate diagnoses of
bipolar disorder and some form of drug and alcohol dependence.  (*See* R. 144; 179; 180; 204;
210; 230; 248; 299; 300; 322; 337; 359.)  Even looking at the evidence most favorably to the
Commissioner, the ALJ's determination cannot be justified.

### 1.   Evidence on Which the ALJ Purportedly
### Relied in Support of Her Finding

The ALJ relied heavily on the report of consulting psychiatrist Herbert Meadow to

support her finding that Plaintiff's substance abuse materially contributed to his disability.

(R. 23-24.)  As noted above, Dr. Meadow examined Plaintiff on October 1, 2003, and believed

that Plaintiff's intellect was average and his insight and judgment were unimpaired.  (R. 248.)

He also stated his opinion that Plaintiff suffered from some "moderate difficulties" that would

impair his ability to work.  (*Id*.)  But while the ALJ apparently read Dr. Meadow's report to

mean that these moderate difficulties were traceable solely to Plaintiff's bipolar disorder, and

that, in the absence of any substance abuse, Plaintiff would have only "moderate" limitations on

his ability to work,[12] the report does not actually state this.  In fact, Dr. Meadow never articulated

an opinion as to the probable severity of Plaintiff's psychiatric condition, absent polysubstance

abuse.

Further, Dr. Meadow noted that Plaintiff was using cocaine daily at the time of the

examination.  (R. 247.)  Given that Dr. Meadow did not examine Plaintiff during a period of

sobriety and offered no opinion as to the effects of Plaintiff's bipolar disorder by itself, his report

cannot be fairly read to suggest that Plaintiff would be able to work, were his substance abuse to

cease.  *Cf. Ward v. Astrue*, No. 06-CV-374, 2008 U.S. Dist. LEXIS 52142, at *17 (W.D.N.Y.

Jul. 3, 2008) (finding substantial evidence in support of determination that substance abuse was

contributing factor material to disability in part because "treating and consulting physicians

---

[12] *See* R. 23-24 (at which the ALJ states:  "[Dr. Meadow] indicated that Plaintiff had
moderate difficulties in occupational adjustment supporting a finding that [Plaintiff's]
concentration, persistence, or pace is moderately limited by his bipolar disorder *exclusive of the
effects of his substance addiction*") (emphasis added).

found that when [p]laintiff was medicated and not under the influence of drugs and/or alcohol, he was capable of functioning and working"); *Kelly*, 2008 U.S. Dist. LEXIS 25150, at *21 (finding substantial evidence to support determination that substance abuse was contributing factor material to disability in part based on physician's report concluding that, if plaintiff's drug use were to stop, his remaining impairments would not be disabling).

The ALJ also relied on other evidence that is similarly lacking in probative value on the question of whether Plaintiff's bipolar condition was disabling on its own. The ALJ noted, for example, that the fact that Plaintiff "was able to teach for four months in 2004" supported her finding that, if Plaintiff's drug and alcohol use were to cease, his bipolar disorder would not result in marked difficulties in maintaining social functioning (the second factor listed in paragraph B of section 12.04 of Appendix 1). (R. 23.) Yet there is nothing in the record to suggest that Plaintiff had abstained from using drugs or alcohol during the months in which he worked in 2004, and that he had used drugs or alcohol during surrounding periods when he did not work, such that an inference might be reasonably drawn that his sobriety was what enabled him to maintain employment. On the contrary, Plaintiff did not maintain employment between March and September of 2004, and during much of 2005, when, based on the only evidence in the record on the subject, he remained sober.[13]  (R. 391; *see also* R. 359-60.)

The ALJ also implied that Plaintiff's disciplinary issues and his inability to get along with others in group therapy sessions – both of which supported her initial finding that Plaintiff's bipolar disorder combined with the effects of substance abuse was disabling – would cease, if

---

[13] Despite the ALJ's implied finding to the contrary (*see* R. 26), nothing in the record evidences any drug abuse by Plaintiff after January, 2004 (*see* R. 346), or alcohol abuse after March, 2004 (*see* R. 291).

Plaintiff were to stop consuming drugs and alcohol.  (*See* R. 23 ("[Plaintiff]'s repeated instances of noncompliance with both medication and treatment are clearly related to his ongoing polysubstance abuse."))  The ALJ, however, did not explain how she reached this conclusion, and the evidence documenting Plaintiff's difficulties with group therapy actually suggests that these problems persisted in the absence of substance abuse.  This evidence includes in-patient treatment records from the Smithers Center, prepared during Plaintiff's January, 2003, hospitalization (*see* R. 339-40; 343), as well as chart notes from his treatment at Beth Israel, dated May 26, 2003 (R. 206-08), both of which suggest that Plaintiff was engaging in uncooperative, disruptive, or otherwise socially unacceptable behavior.  Assuming that Plaintiff was not using drugs or alcohol during the times when he was receiving in-patient care, these records suggest that substance abuse, standing alone, was not the sole cause of Plaintiff's social functioning problems.  *Cf. Tablas*, 2000 WL 423194, at *4-5 (finding substantial evidence to support determination that substance abuse was material contributing factor where Plaintiff's condition improved during periods of hospitalization).

Similarly, the record does not support the inference drawn by the ALJ that Plaintiff would have complied with psychiatric treatment, had he refrained from consuming drugs and alcohol.  (*See* R. 28.)  While the record documents Plaintiff's admission in January, 2004, that he did not want mental health treatment and wanted to continue using crack (R. 346), it also shows that Plaintiff was non-compliant with treatment throughout 2004, including during periods when he was apparently sober (*see*, *e.g.*, R. 280-84; 391).

All in all, the ALJ's opinion does not explicitly reference any evidence that, when closely examined, is probative on the question of whether, absent substance abuse, Plaintiff would retain the ability to work.

### 2.   No Other Evidence in the Record Provides Substantial Support for the ALJ's Finding.

Even looking beyond the evidence cited by the ALJ in her opinion, this Court can discern no substantial basis in the record for the ALJ's finding that Plaintiff's substance abuse was a material contributing factor to his disability.

First, nothing in Plaintiff's testimony at the administrative hearing suggested that Plaintiff's drug and alcohol abuse materially contributed to the disabling affects of his bipolar disorder.  To the contrary, Plaintiff testified that, although he had had a substance abuse problem, drugs and alcohol had never affected his ability to maintain employment.  (R. 397; 399; 407.)  Rather, Plaintiff testified that his frequent absences from work had been the result of either mental illness or sickness, which was a side effect of his psychiatric medications.  (*Id*.) Although the ALJ questioned Plaintiff's credibility (R. 26), the mere rejection of a claimant's testimony, without more, is not a sufficient ground on which to deny a claim for disability benefits.  *See Rivera v. Heckler*, 618 F. Supp. 1173, 1178-79 (S.D.N.Y. 1985).

Second, while the record contains some evidence that Plaintiff's disability was more pronounced because of the combination of his bipolar disorder and substance abuse,[14] it generally does not demonstrate that Plaintiff's symptoms of mental illness improved with a

---

[14] In Plaintiff's application for disability benefits, for example, he admitted that his "struggle with substance abuse *combined with* depression and mania [made] for an unfortunate and unpredictable existence."  (R. 98 (emphasis added).)

reduction in drug or alcohol use, or worsened with intoxication.  *Cf. Eltayyab*, 2003 U.S. Dist. LEXIS 21945, at *13-14 (finding substantial evidence that Plaintiff's alcoholism and drug abuse were contributing factors material to disability, where, *inter alia,* medical evidence suggested that symptoms of mental illness arose with intoxication); *Tablas v. Apfel*, No. 98 Civ. 5430 (RMB), 2000 WL 423914 (S.D.N.Y. Mar. 21, 2000) (finding drug and alcohol dependence to be contributing factors material to disability where evidence showed that impairments worsened with intoxication and improved during periods of sobriety); *Kelly v. Barnhart*, No. 07-CV6302, 2008 U.S. Dist. LEXIS 25150 (W.D.N.Y. Mar. 28, 2008) (same).

The closest indication of this is the report of Dr. Fredrickson, which states that, as of February 10, 2006, Plaintiff's polysubstance dependence was in full remission and that his symptoms were then "stable."  (R. 359.)  Dr. Fredrickson also wrote that, when she had treated Plaintiff in 2003, his polysubstance dependence had been active and, at that time, he had exhibited "disorganized thinking, racing thoughts, grandiose ideas, [and] little insight."  (*Id.*) While Dr. Fredrickson's 2006 report does suggest that the symptoms of Plaintiff's bipolar disorder improved with sobriety, it is not clear if Dr. Fredrickson, by reporting only that Plaintiff's symptoms had stabilized, believed that Plaintiff's bipolar disorder, in the absence of substance abuse, was not disabling.  Indeed, the report cannot be fairly read as offering any sort of opinion as to Plaintiff's ability to perform activities of daily living, as to any difficulties he may have had with social functioning (*see supra*, at 20-21 n.6), or, in general, whether Plaintiff was then capable of maintaining employment.  In short, while Dr. Fredrickson's report offers

some support for the ALJ's materiality finding, the single word "stable," without further

explanation, does not provide a substantial basis for it.[15]

Third, the record sheds little light on whether one of Plaintiff's problems led to the other,

or *vice versa,* or whether the two problems (his substance abuse and mental illness) simply co-

existed.  For example, while the fact that Plaintiff was hospitalized in May, 2003, right after

engaging in heavy drug use, may suggest that Plaintiff's substance abuse caused his mental

health to deteriorate, the same fact may equally suggest that his bipolar disorder caused Plaintiff

to drink or use drugs.  (*See* R. 146 (Plaintiff describing that, when he experienced a manic

episode, he would go on "drug binges").)  Further, while several physicians did diagnose

Plaintiff with "substance induced mood disorder"  (R. 147; 179; 190; 204; 230), the very doctors

who diagnosed this condition *also* reported separate diagnoses of bipolar disorder and/or other

psychiatric conditions that were *not* secondary to drug or alcohol dependence.  (*See id.*)  In light

of this, the diagnoses of substance induced mood disorder found in the record do not support the

ALJ's conclusion that Plaintiff's bipolar condition would not be disabling in the absence of

substance abuse.  *See Ostrowski v. Barnhart*, No 3:01cv2321 (PCD), 2003 U.S. Dist. LEXIS

19144 (D. Conn. Oct. 10, 2003) (reversing and remanding ALJ decision where administrative

---

[15] Additionally, the record shows that Plaintiff was first diagnosed with bipolar disorder
in 1997 (R. 196), and Plaintiff asserts that his psychiatric symptoms steadily worsened thereafter,
to the point where, in 1999, these symptoms began to interfere with his ability to work (*see* R.
104).  Yet no evidence shows that Plaintiff had begun to use drugs more heavily over that time,
such that an inference could be drawn that the disabling effects of Plaintiff's psychiatric
condition were caused by substance abuse.  In fact, the medical evidence indicates that Plaintiff
was using drugs long before 1997 and that he began taking cocaine and heroin intravenously in
1994, well before the claimed onset of his disability.  (R. 146.)

record was inconclusive on issue of materiality of substance abuse, despite some medical records diagnosing plaintiff with substance induced mood disorder).

Fourth, the extent of Plaintiff's abilities while sober was directly called into question by one of Plaintiff's treating physicians, Dr. Senay, who, in early 2006, apparently examined Plaintiff during a period of sobriety,[16] and nonetheless determined that Plaintiff's ability to perform work-related activities was significantly limited by his mental health problems.  (*See* R. 356-58.)  On February 10, 2006, Dr. Senay concluded – with no reference to substance abuse – that Plaintiff had long term psychiatric conditions, including bipolar disorder (R. 357-58), and that his "vacillating mental condition would impair [his] ability to maintain employment . . . [and] would prevent sustained employment" (R. 358).

This report by Dr. Senay strongly suggests that Plaintiff's bipolar disorder was independently disabling for purposes of the Act.  *Cf. Cordero v. Astrue*, 574 F. Supp. 2d 373, 378 (S.D.N.Y. 2008) (finding substantial evidence to support ALJ's finding that plaintiff would not be disabled absent substance abuse where evidence showed that Plaintiff was sober for extended period of time during which his psychiatrist noted that he was "alert, stable, experiencing no symptoms of schizophrenia, calm, and in a pleasant mood").  Yet the ALJ did not even mention Dr. Senay's report in her decision, much less explain why she failed to give it

---

[16] On the same date in February, 2006, when Dr. Senay examined Plaintiff, he was also examined by Dr. Fredrickson, who, as noted above, concluded that Plaintiff's polysubstance dependence was "in full remission" at that time.  (R. 359.)  This is consistent with Plaintiff's testimony that he had stopped using drugs and alcohol in 2003 or 2004 and that, aside from a one-week relapse in 2005, he had remained sober until at least November 10, 2005.  (R. 391.)

controlling weight.[17]  This alone constitutes error.  *See, e.g.*, *Reyes v. Shalala*, No. 94 Civ. 981

(DLC), 1995 U.S. Dist. LEXIS 1695, at *8-9 (S.D.N.Y. Feb. 8, 1995).

Finally, the reports of the medical consultants were inconclusive on the question at hand;

*i.e.*, the question of whether Plaintiff's mental health problems would have been independently

disabling in the absence of substance abuse.  While consulting psychiatrist Richard King found

Plaintiff capable of performing daily activities, he also diagnosed him with both dysthymia

disorder and drug dependence, and noted that Plaintiff's prognosis would be dependent on the

course of his illness, without separating out these different components.  (R. 147.)  Consulting

physician Herman Berliss opined that Plaintiff's mental residual functional capacity was not

significantly limited (R. 154-65), but gave no indication as to whether he had examined Plaintiff

during a period of sobriety, and thus his opinion does not speak to the question of whether

Plaintiff's functional capacity at the time was linked to an absence of substance abuse.

Likewise, although consulting psychologist Kusum Walia found that Plaintiff had certain

limitations (R. 253-55; *see also* R. 273), his report offered no insight as to how Plaintiff might

have been separately affected by his mental illness and his substance abuse.  In short, none of

these consultants made any determination as to whether Plaintiff's disability, as initially

identified by the ALJ, would be expected to disappear with sobriety.  *Cf. Eltayyab*, 2003 U.S.

Dist. LEXIS 21945, at *15 (finding substantial evidence to support materiality finding and

---

[17] Although the reports of both Drs. Senay and Fredrickson were prepared after the November 10, 2005, hearing, they were submitted, and made part of the administrative record, before the ALJ rendered her final decision.  Especially given that, at the administrative hearing, the ALJ had directed Plaintiff to submit further evidence in support of his claim (R. 409), the Court assumes that the ALJ had these reports in hand before she denied Plaintiff's application for benefits on March 7, 2006.

noting that medical evaluation "plainly shows that [plaintiff]'s therapists believed that his depression and isolation stemmed in large part from his substance abuse" and that they expected that his symptoms would subside with sobriety).

Overall, while the administrative record supports a finding that Plaintiff has suffered from both drug and alcohol dependence and bipolar disorder, it is simply not possible to determine from the record that the effects of the two conditions are separable and that Plaintiff's bipolar disorder would not be disabling on its own. Consequently, this Court cannot conclude that "substantial evidence" supported the ALJ's finding that Plaintiff's substance abuse was a contributing factor material to his disability.

### C. The ALJ's Use of the Medical Vocational Guidelines (the "Grids").

Plaintiff additionally argues that the ALJ erred by failing to consult a vocational expert and by instead relying solely on the Medical Vocational Guidelines (the so-called "grids"), *see* 20 C.F.R., Pt. 404, Subpt. P, App. 2, in order to determine that Plaintiff was not disabled, despite having a moderate limitation in concentration, persistence, or pace (Pl. Mem., at 16-17). Specifically, Plaintiff argues that the ALJ erred by assuming that a restriction to unskilled work would necessarily accommodate a claimant with this type of limitation. (R. 24; 25.) According to Plaintiff, unskilled work requires the ability to concentrate on tasks "and to persist in performing them at a given rate" (Pl. Mem. 16-17), and the ALJ was required to solicit the opinion of a vocational expert on the issue of whether work existed in the national economy that Plaintiff would be able to perform (*see id.*).

Limitations in concentration, persistence, and pace constitute nonexertional limitations under the Commissioner's regulations. *See* 20 C.F.R. §§ 404.1569a(c), 416.969a(c). The

existence of a nonexertional limitation does not automatically require the production of a vocational expert, nor does it preclude reliance on the grids. *Bapp*, 802 F.2d at 603. Rather, only if a claimant's nonexertional impairments "significantly diminish his ability to work – over and above any incapacity caused solely from exertional limitations – so that he is unable to perform the full range of employment indicated by the medical vocational guidelines," is the testimony of a vocational expert required. *Id*.

Given this authority, the Court is not persuaded by Plaintiff's argument that an ALJ must consult a vocational expert every time he or she finds limitations in concentration, persistence, or pace. The Court notes, however, that the ALJ here did not make an express finding as to whether Plaintiff's nonexertional limitations significantly diminished his ability to meet the requirements of light work. (R. 26-27.) This too constitutes error. *See Bapp*, 802 F.2d at 606; *Suarez v. Commissioner of Social Security*, No. 06 Civ. 2868 (HBP), 2009 U.S. Dist. LEXIS 25228, at *34-37 (S.D.N.Y. Mar. 26, 2009); *Ostrowski*, 2003 U.S. Dist. LEXIS 19144, at *13-15.

### D.   Remand Is Appropriate in These Circumstances.

On the record presented, it would be appropriate for this Court to remand this case to the ALJ. *See Rosa*, 168 F.3d at 82-83 (noting that remand is appropriate where further development of the record is necessary). On remand, the ALJ should be directed to consider Dr. Senay's report (in light of Dr. Fredrickson's report of the same date) with respect to the issue of whether Plaintiff would still be disabled in the absence of substance abuse, and develop the record as necessary to ascertain the proper weight to accord Dr. Senay's report under 20 C.F.R. §§ 404.1527 and 416.927. *See Dhanraj v. Barnhart,* No. 04 Civ. 5537 (MBM), 2006 U.S. Dist.

LEXIS 24838, at *26-27 (S.D.N.Y. May 1, 2006).  In addition, if the ALJ determines that

Dr. Senay's report lacks adequate detail, explanation, or support, then the ALJ should be directed

to recontact Dr. Senay for clarification or, at a minimum, to allow Plaintiff to obtain a more

detailed supplementation from her.  *See* 20 C.F.R. § 404.1512(e)(1) (Commissioner must

recontact the claimant's treating physician when the physician's report "contains a conflict or

ambiguity that must be resolved, the report does not contain all the necessary information, or

does not appear to be based on medically acceptable clinical and laboratory diagnostic

techniques"); *see also* 20 C.F.R. § 416.912(e).

  If, thereafter, the record is still inconclusive as to whether Plaintiff's substance abuse

disorder is a contributing factor material to his disability, then the ALJ should further

supplement the record in accordance with 20 C.F.R. §§ 404.1512 and 416.912.  *See*, *e.g.*,

20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician or

psychologist or other medical source is inadequate for us to determine whether you are disabled,

we will need additional information to reach a determination or a decision.").  This may require

the ALJ to solicit further information from Plaintiff's treating sources as to the likely effects of

Plaintiff's bipolar disorder, absent the effects of substance abuse, and could include further

evidence relevant to whether and to what extent the symptoms of Plaintiff's bipolar disorder

persisted through periods of sobriety and/or worsened with intoxication.  *See Ostrowski*, 2003

U.S. Dist. LEXIS 19144 (remanding case for further development of record where evidence was

inconclusive on materiality issue).

  If the information from the treating sources proves to be unavailable or insufficient, the

ALJ should also be directed to order a consultative examination pursuant to 20 C.F.R.

§§ 404.1512(f) and 416.912(f), for the purpose of identifying, to the extent possible, the symptoms and effects of Plaintiff's bipolar disorder, apart from the effects of his drug and alcohol dependence.  If the medical sources conclude that the effects of Plaintiff's bipolar and substance abuse disorders simply cannot be separated, then the ALJ should consider whether Plaintiff would nevertheless be entitled to benefits under those circumstances.[18]

Furthermore, if the ALJ again determines that Plaintiff, were he to refrain from substance abuse, would not be disabled under step three of the five-step procedure, but would still suffer from various exertional and nonexertional limitations, the ALJ should consider whether Plaintiff's nonexertional limitations significantly diminish his ability to work.  In the event that they do, the ALJ should be directed to consult a vocational expert.

------

[18] Although Plaintiff bears the burden of proving that his substance abuse is not a material contributing factor to his disability, *see Lugo*, 2008 U.S. Dist. LEXIS 16926, at *64, there is some case authority for the proposition that, where it is not medically possible to separate out the effects of mental illness and substance abuse, an award of benefits should be made.  *See, e.g., Salazar v. Barnhart*, 468 F.3d 615 (10th Cir. 2006) (reversing ALJ decision and remanding solely for award of benefits where ALJ's materiality finding was not supported by substantial evidence and record suggested that a medical professional would not be able to formulate an opinion as to the effects of claimant's mental impairments absent drug abuse); *Pratt v. Apfel*, No. C99-0002L, 2000 U.S. Dist. LEXIS 14491 (W.D. Wash. Jul. 5, 2000) (reversing ALJ decision and remanding solely for an award of benefits where evidence suggested that the effects of claimant's substance abuse and mental health problems could not be separated).  The courts that have so held have generally cited to a 1996 internal SSA rule, which has not been cited to this Court by any party in this case.  The rule, identified in other cases as "Social Security Advisory Service DAA Q&A Teletype, dated Aug. 30, 1996," apparently states that "[w]hen it is not possible to separate the mental restrictions and limitations imposed by [substance abuse] and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate."  *Pratt*, 2000 U.S. Dist. LEXIS 14491, at *4.  Upon remand, I recommend that the ALJ be directed to consider whether this rule is still extant and, if so, to give it appropriate consideration.  *See Ostrowski,* 2003 U.S. Dist. LEXIS 19144, at *13 ("It seems, regardless of whether the Teletype is binding, that it represents the sound judgment of the Agency and would be persuasive in that respect.").

## CONCLUSION

For the foregoing reasons, I recommend that this matter be remanded to the

Commissioner, with a direction to the ALJ:

    (1)      to evaluate the opinion of Dr. Senay, in light of Dr. Fredrickson's report of the same date and the factors listed in 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2), and, if this opinion is not assigned controlling weight, to provide good reasons for this;

    (2)      to develop the record to the extent necessary to make a fully reasoned determination as to whether Plaintiff's substance abuse was a contributing factor material to the finding of disability, which will require the ALJ to seek further information from Plaintiff's treating sources as to the probable symptoms and effects of Plaintiff's bipolar disorder, separate and apart from the effects of drug and alcohol abuse;

    (3)      if information from the treating sources proves to be inconclusive or unavailable, to order a consultative examination of Plaintiff with a direction to the physician or practitioner performing the examination to articulate an opinion as to the severity of Plaintiff's bipolar disorder, absent the effects of his drug and alcohol use; and

    (4)      if the ALJ again finds that Plaintiff would not be disabled at step three of the five-step procedure, were he to refrain from substance abuse, but that he would still suffer from various exertional and nonexertional limitations, to consider whether Plaintiff's nonexertional limitations significantly diminish his ability to work and, if they do, to consult a vocational expert to determine if Plaintiff is capable of performing other work that exists in the national economy.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have 10 (ten) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Jed S. Rakoff, United States Courthouse, 500 Pearl Street, Room 1340, New York, New York,

10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York, 10007.  Any requests for an extension of time for filing

objections should be directed to Judge Rakoff. FAILURE TO FILE OBJECTIONS WITHIN

TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension*

*Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298., 300 (2d

Cir 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
     July 6, 2009

          Respectfully submitted,

          DEBRA FREEMAN
          United States Magistrate Judge

Copies to:

The Honorable Jed S. Rakoff, U.S.D.J.

Charles E. Binder, Esq.
Binder and Binder, P.C.
215 Park Avenue South, 6th Floor
New York, NY 10003

Susan Branagan
Assistant U.S. Attorney
86 Chambers St.
New York, NY 10007